UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

JUCH-TECH, INC.,                              :

                          Plaintiff,          :

        -against-                             :

INTELSAT CORP.,                               :

                          Defendant.          :

----------------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:    8/21/14
```

**REPORT AND
RECOMMENDATION
TO THE HONORABLE
LEWIS A. KAPLAN**

13cv8885-LAK-FM

**FRANK MAAS**, United States Magistrate Judge.

This diversity action arises out of a failed business relationship between

Plaintiff Juch-Tech, Inc. ("Juch-Tech"), a Canadian company, and Defendant Intelsat

Corporation ("Intelsat"), a Delaware corporation, and related entities ("Intelsat Entities"),

regarding the provision of satellite communications services. Several years before Juch-

Tech filed this action, Intelsat filed a related lawsuit against Juch-Tech in the United

States District Court for the District of Columbia ("D.C. Action"). In its Complaint in

this action, Juch-Tech alleges that in order to induce Juch-Tech to enter into several

agreements, Intelsat purposely made fraudulent misrepresentations regarding the

customers whose accounts would be assigned to Juch-Tech, the equipment Juch-Tech

would receive, and Intelsat's title to that equipment.

Intelsat has now moved for judgment on the pleadings pursuant to Federal

Rule of Civil Procedure 12(c), alleging that Juch-Tech's claims are barred by the statute

of limitations.  More specifically, Intelsat contends that the filing of Juch-Tech's counterclaims in the D.C. Action establishes that its claims in this action could have been brought prior to July 2011 and therefore are barred by the applicable two-year statute of limitations.  Intelsat also has moved for leave to file a supplemental pleading to assert a counterclaim against Juch-Tech for its alleged breach of a forum selection clause.

For the reasons set forth below, I recommend that Intelsat's motion for judgment on the pleadings be granted.  Additionally, I recommend that Intelsat's motion for leave to amend be denied.

I.      Procedural Background

Juch-Tech originally filed its summons and complaint in this action in Supreme Court, New York County, on November 26, 2013.  (ECF No. 1, Ex. A ("Complaint" or "Compl.")).  Thereafter, on December 16, 2013, Intelsat removed the suit to this Court based upon diversity of citizenship.  (Id. at 1-3).  After Intelsat filed its answer on December 23, 2013, (ECF No. 3), Juch-Tech filed a motion to remand the action to state court, which was denied on February 4, 2014, (ECF Nos. 6, 12).  Subsequently, on February 24, 2014, Intelsat moved for judgment on the pleadings and for leave to file a supplemental pleading to add a counterclaim against Juch-Tech.  (ECF No. 14).  Juch-Tech filed its opposition papers on March 13, 2014, and Intelsat filed its reply papers on March 24, 2014.  (ECF Nos. 22-29).  The motions consequently are fully briefed.

II.     Facts

The following facts taken from the Complaint are presumed to be true:

A.      Parties

Juch-Tech is a Canadian "telecommunications service provider for managed connectivity for wide area networks in under-served geographic regions," with a principal place of business in Ontario, Canada.  (Compl. ¶¶ 6, 12).

Intelsat is a Delaware corporation specializing in the provision of satellite services.  (See id. at ¶¶ 7, 10).  Intelsat is part of a larger enterprise that includes a parent company, Intelsat S.A., and other Intelsat Entities, including Intelsat Global Sales & Marketing, Ltd. ("Intelsat Global Sales"), Intelsat USA Sales Corp. ("Intelsat USA"), and Intelsat Global Services Corporation.  (Id. ¶ 3-A).[1]

B.      Original Agreement

Juch-Tech's relationship with the Intelsat Entities dates back to at least January 7, 2005, when Juch-Tech and Intelsat USA entered into a "Non-Exclusive Sales Agreement" ("NES Agreement"), pursuant to which Intelsat USA agreed to provide Juch-Tech with "satellite transponder space segment and support services."  (Id. ¶ 13).  Those services, in turn, were described in greater detail in subsequent "service orders."  The parties executed two such service orders under the NES Agreement, through which Juch-

_____

[1]     The Complaint contains three paragraphs numbered as paragraph "3."  To distinguish among them, I have assumed that they are labeled as paragraphs "3-A," "3-B," and "3-C."

Tech leased space on two Intelsat-owned satellites.  Alicia Schwarcz ("Schwarcz"),

Intelsat USA's Senior Sales Director, handled these transactions with Juch-Tech.  (Id.).

      C.     <u>Linkstar Negotiations</u>

          In 2008, Schwarcz and Colleen Parent ("Parent"), an employee of Intelsat

Global Sales, approached Juch-Tech's President, Wlodzimierz Juchniewicz

("Juchniewicz"), to propose that Juch-Tech lease satellite space on a new Intelsat satellite,

IS-14, due to be launched in October 2009.   The proposed lease, however, was "too

expensive" for Juch-Tech.  (<u>Id.</u> ¶ 15).  Consequently, in an effort to make the deal more

attractive, Parent and Schwarcz suggested that Intelsat assign to Juch-Tech certain

customer contracts that already were producing "substantial revenues," and sell Juch-

Tech certain "Linkstar hub equipment."  (<u>Id.</u> ¶ 16).  The customer accounts that Intelsat

proposed to assign included the accounts of Bentley Walker Ltd. ("Bentley Walker"),

DCC Satellite Networks Ltd. ("DCC"), Easynet Concepts, LLC, Mattel, Millennium

Consulting Sarl ("Millennium"), and Q-KON.  (<u>Id.</u> ¶ 21).  Parent and Schwarcz

represented that Intelsat was "prepared to make the assignments of these customers and

sell the equipment because it was getting out of the business of directly serving customers

in Africa."[2]  (<u>Id.</u> ¶ 16).  The proposal contemplated that Juch-Tech would initially use

space on Intelsat's IS-1R satellite to service the new accounts and, later, would use space

on IS-14, its replacement.  (<u>Id.</u> ¶ 3-C).

---

       [2]     The Complaint states that a third Intelsat employee, Joanne Tanner ("Tanner"), also "presented" the proposed transaction to Juch-Tech, but does not further indicate what she did.  (<u>See</u> Compl. ¶ 17).

In November 2008, Parent sent Juch-Tech a non-disclosure agreement ("NDA").  Parent copied Schwarcz on this "delivery," stating that the NDA had to be signed before "she or Schwarcz would answer any . . . questions about the transaction." (<u>Id.</u> ¶ 17).  Juch-Tech alleges that the NDA was part of Intelsat's effort to "imbue [its] representations with the aura of 'confidentiality' and 'accuracy'" in furtherance of its fraud.  (<u>Id.</u>).

Over the following months, Juch-Tech continued negotiations with representatives of various Intelsat Entities.  During those discussions, on December 1, 2008, Schwarcz and Tanner represented to Juch-Tech officers that all of the "equipment on IS-1R [was] in working condition."  (<u>Id.</u> ¶ 18).  Additionally, on various occasions in March 2009, Schwarcz represented to Juch-Tech, both verbally and via email, that the customers whose contracts were being assigned had good relationships with Intelsat and strong revenue streams.  (<u>See</u> <u>id.</u> ¶¶ 23-25).  Schwarcz and Intelsat's Assistant General Counsel, Denise Olmstead ("Olmstead"), also represented that Intelsat owned the equipment that it intended to sell to Juch-Tech.  (<u>Id.</u> ¶ 26).

On February 27, 2009, Schwarcz emailed Juch-Tech a copy of a document termed the "Linkstar Platform Agreement," which became the basis for the final agreement executed later that year.  That final agreement had two components – a "Transition Agreement" that memorialized the major elements of the deal, and a "Service Order" that set forth the "terms for [Juch-Tech's] lease of the IS-1R space segment to be later transitioned to IS-14."  (<u>Id.</u> ¶ 19).  The Transition Agreement provided, <u>inter</u> <u>alia</u>,

that (1) Juch-Tech would lease capacity on the Intelsat satellites; (2) Intelsat would assign to Juch-Tech "11 identified customer contracts for six customers;" and (3) Intelsat would sell Juch-Tech the "Linkstar Hub equipment" serving those customers.  (Id.).  The emailed documents expressly indicated that the Transition Agreement would be "ratified" by Intelsat, while the Service Order would be "ratified" by Intelsat USA.  (Id.).  When she sent the email, Schwarcz copied, among other persons, Olmstead and Intelsat's Senior Contracts Manager.  (Id.).

On March 27, 2009, Juch-Tech and Intelsat executed both the Transition Agreement and the Service Order.  (Id., Exs. A (Transition Agreement), B (Service Order) (together, the "2009 Agreements")).[3]  Juchniewicz signed the Transition Agreement for Juch-Tech, and Patricia Casey, Intelsat's Senior Vice President and Deputy General Counsel, signed for Intelsat.  The Transition Agreement identifies Intelsat as a "Delaware corporation," and states that its provisions "are for the benefit only of Intelsat and Juch-Tech and no third party may seek to enforce or benefit from [them]."  (Transition Agreement ¶ 7(*l*)).  The Transition Agreement further incorporates a choice of law clause which provides that New York law shall govern its "validity, construction and performance."  (Id. ¶ 7(c)).  Additionally, the Transition Agreement contains a forum selection clause, which provides that each signatory:

---

[3]     The Service Order is not actually annexed to the publicly-filed Complaint; a redacted copy of the first page explains that it has been designated "Intelsat Confidential and Proprietary" information.  (See Compl. Ex. B).

agrees to commence any action, suit or proceeding arising out of this Agreement in the United States District Court for the Southern District of New York or if such suit, action or proceeding may not be brought in such court for jurisdictional reasons, in the Supreme Court of the State of New York, New York County.

(Id. ¶ 7(d)).

After the parties executed the 2009 Agreements, Juch-Tech discovered that Intelsat's prior representations were materially misleading or untrue.  For example, "several of the customers whose contracts [had been] assigned were not good customer[s,] were delinquent in their payments for services," and were "not good candidates for contract renewals or extensions."  (Compl. ¶ 29).  Moreover, there were "concerns about the Linkstar/IS-1R Platform's poor performance based upon customer complaints and . . . its former owner's inability to manage the troubled system profitably."  (Id.).  Intelsat also did not own all of the equipment it had pledged to transfer to Juch-Tech.  (Id. ¶ 26).  Indeed, after the 2009 Agreements were signed, "Bentley Walker and then Q-KON each submitted demands for some of the equipment," leading Intelsat employees to "admit[] that Bentley Walker and Q-KON owned [the] equipment."  (Id.).  Intelsat employees then "requested that [Juch-Tech] deliver the equipment to the rightful owners," but "offered no compensation" to Juch-Tech for these relinquished assets.  (Id.).

On July 17, 2009, Tim Hewett, an engineer with Intelsat Global Services, admitted to Juch-Tech that Intelsat was aware prior to ratifying the 2009 Agreements that

DCC was "actually a 'known trouble maker' likely to 'work the system to [its] benefit.'"
(Id. ¶ 33).  The Complaint does not specify when Juch-Tech became aware of any other
facts giving rise to its claims in this action.

      D.     D.C. Action[4]

          Intelsat USA filed the D.C. Action against Juch-Tech on December 10,
2010.  (See ECF No. 15 (Decl. of John J. Calandra, Esq., dated Feb. 24, 2014, ("Calandra
Decl.")), Ex. 4 ("D.C. Complaint" or "D.C. Compl.")).  In that action, Intelsat USA
asserted claims for breach of contract and unjust enrichment in relation to the 2005 NES
Agreement.  (Id.).  Juch-Tech answered the D.C. Complaint on July 11, 2011.  (Id., Ex. 2
("D.C. Answer")).

          In its D.C. Answer, Juch-Tech brought counterclaims against Intelsat USA
under New York law for breach of contract, fraud, fraudulent misrepresentation, tortious
interference with contractual relations, tortious interference with business relations, and
defamation.  Juch-Tech also asserted counterclaims under Canadian law.  (Id.).  In
support of its counterclaims, Juch-Tech detailed the negotiation history previously

_____

[4]     The facts in this section are drawn from the declaration of Mark L. Shaffer, Esq.,
filed as part of Juch-Tech's opposition to Intelsat's present motion, (ECF No. 26 (Decl. of Mark
L. Shaffer, Esq., dated March 11, 2014 ("Shaffer Decl."))), as well as the filings in the D.C.
Action, Intelsat USA Sales Corp. v. Juch-Tech, Inc., No. 10 Civ. 2095 (RC).  Courts ordinarily
may take judicial notice only of the fact that documents were filed in unrelated cases, not their
contents.  Courts may, however, take judicial notice of the contents of party admissions that
contradict statements made to the court being asked to consider them.  See, e.g., Jackson v.
Broad. Music, Inc., No. 04 Civ. 5948 (TPG), 2006 WL 250524, at *7 (S.D.N.Y. Feb. 1, 2006);
Munno v. Town of Orangetown, 391 F. Supp. 2d 263, 268 (S.D.N.Y. 2005); Harris v. N.Y. State
Dep't of Health, 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002).

described.  (See id. ¶¶ 42-47).  It further alleged that "[s]hortly after" Juch-Tech and

Intelsat executed the 2009 Agreements, Juch-Tech discovered that "Millennium Arrow

did not have a current customer relationship with Intelsat," that "Bentley-Walker was

delinquent in its payments to Intelsat and was in the process of terminating its contract

because it was not pleased with the service provided by Intelsat," and that Intelsat had

"induced DCC . . . and Atlasco (QKON) to terminate their agreements and customer

relationships with Juch-Tech and become, again, Intelsat customers."  (Id. ¶¶ 48-50).[5]

On August 29, 2011, Intelsat USA moved to dismiss Juch-Tech's

counterclaims.  (D.C. Action, ECF No. 12).  On October 4, 2011, while that motion was

being briefed, the parties submitted a joint status report to the Court pursuant to D.C.

Local Civil Rule 16.3.  (Id., ECF No. 16).  In that report, Intelsat USA asked that

discovery in the D.C. Action be stayed until the court resolved the motion to dismiss.

Although Juch-Tech opposed this request, the court granted it pending further order.  (Id.

¶ 1).  The court later issued its decision regarding Intelsat USA's motion to dismiss on

March 27, 2013, at which time it denied the motion as to eight, but granted it as to three,

of Juch-Tech's counterclaims.  (D.C. Action, ECF No. 21).

On June 7, 2013, the parties to the D.C. Action exchanged their Rule

26(a)(1) disclosures.  (Id., ECF Nos. 33-34).  The Intelsat USA disclosure identified as

---

[5]     The D.C. Answer fails to explain the relationship between Millennium and
Millennium Arrow.  Both the Complaint in this action and the D.C. Answer indicate, however,
that the accounts of six specific customers were assigned to Juch-Tech.  (Compl. ¶ 21; D.C.
Answer ¶ 46).  If so, the two Millennium entities presumably are the same.

"[i]ndividuals likely to have discoverable information" a number of Intelsat and Intelsat USA employees, including Parent, Tanner, and Schwarcz.  Intelsat USA did not identify the company that employed each person, but did provide their contact addresses.  (Id., ECF No. 34, ¶ 1).

When Juch-Tech thereafter served its first set of discovery requests, Intelsat USA responded by objecting to many of them.  The parties thereafter exchanged letters and participated in discovery conferences.  During one such conference on October 28, 2013, Intelsat USA's counsel informed Juch-Tech's counsel that Juch-Tech was "wrong in its understanding that . . . Schwarcz worked for [Intelsat USA]" and that she instead had worked for Intelsat during the period that the entities negotiated the terms of the 2009 Agreements.  (Shaffer Decl. ¶ 14).  Intelsat's counsel also informed Juch-Tech's counsel that Intelsat USA "did not receive much from [Intelsat] about the assigned customers" during the negotiations, that Intelsat USA "d[id not] possess any documents related to the [2009 Agreements], except the Agreement documents," and that Intelsat "possesse[d] the documents related to the assigned customers, service complaints, contracts, and service orders."  (Id.).

On December 20, 2013, as part of its opposition to a defense motion for partial summary judgment in the D.C. Action, Intelsat USA submitted the affidavit of Stephen A. Chernow, a member of the Board of Managers of Intelsat USA, who also served as its secretary.  In that affidavit, Chernow stated that Intelsat acted as Intelsat USA's agent for "the collection of monies due to Intelsat USA . . . from Juch-Tech . . .

and to interact with Juch-Tech . . . as a customer of Intelsat USA . . . including providing it with notices under the agreements with Juch-Tech." (Id., Ex. D, ¶ 3).[6]

III.   Defendant's Motion for Judgment on the Pleadings

    A.   Standard of Review

        Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings. See, e.g., Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 (2d Cir. 1988). "In deciding a Rule 12(c) motion, [courts] apply the same standard as that applicable to a motion under Rule 12(b)(6), accepting the [non-conclusory] allegations contained in the complaint as true and drawing all reasonable inferences in favor of the nonmoving party." Burnette v. Carothers, 192 F.3d 52, 56 (2d Cir. 1999). Courts generally are constrained from considering matters outside the pleadings without converting a Rule 12(c) motion into one for summary judgment. See Sellers, 842 F.2d at 642. The complaint, however, "is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations omitted) (quoting Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002)). The Court also may

---

        [6]        Although the D.C. Action remains pending, further proceedings have (with one exception) been stayed until August 25, 2014, apparently due to the submission of a motion by one of Juch-Tech's counsel to withdraw from further representation of Juch-Tech. See D.C. Action, ECF No. 126; Minute Order dated July 28, 2014).

take judicial notice of additional matters, <u>Roberts v. Babkiewicz</u>, 582 F.3d 418, 419 (2d Cir. 2009); <u>see</u> Fed. R. Evid. 201, including "admissions in pleadings and other documents in the public record filed by a party in other judicial proceedings that contradict the party's factual assertions in a subsequent action." <u>Harris v. N.Y. State Dep't of Health</u>, 202 F. Supp. 2d 143, 173 n.13 (S.D.N.Y. 2002).

      B.    <u>Discussion</u>

          1.    <u>Applicable Law</u>

               a.    <u>Statute of Limitations</u>

      Because jurisdiction over this action is based on diversity of citizenship, the Court must look to the law of the state in which it sits, including that state's borrowing statute, to determine whether it is timely. <u>See</u> <u>Roman Y Gordillo, S.C. v. Bank of N.Y. Mellon Corp.</u>, No. 12 Civ. 0212 (DF), 2014 WL 1224361, at *12 (S.D.N.Y. Mar. 20, 2014) (citing <u>Liberty Synergistics Inc. v. Microflo Ltd.</u>, 718 F.3d 138, 151 (2d Cir. 2013)); <u>Hart v. Bates</u>, 897 F. Supp. 710, 712 (E.D.N.Y. 1995) (citing <u>Guar. Trust Co. of N.Y. v. York</u>, 326 U.S. 99 (1945)). New York's borrowing statute makes the law of the place in which the action arose applicable. N.Y. C.P.L.R. § 202 ("[A] cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued."). In this case, the parties agree that the timeliness of the action therefore is governed by the Ontario Limitations Act of 2002 ("Act"). (<u>See</u> ECF No. 27 ("Pl.'s Mem.") at 12; ECF No. 17 ("Def.'s Mem.") at 16-17). That Act subjects the claims in

this case to a two-year limitations period, which commences upon discovery.  Pursuant to the Act, a claim is "discovered" on the earlier of two dates:  (a) when a party first knew that (i) the injury or loss occurred (ii) as a result of an act or omission (iii) by the party against whom the claim is made and (iv) a lawsuit would provide the appropriate remedy; or (b) when "a reasonable person with the abilities and in the circumstances of the person with the claim first ought to have known" each of those facts.  Act § 5(1)(a), (b).

> b.    Tolling

"Where, as here, New York's borrowing statute requires application of another state's statute of limitations, that state's tolling and other related provisions will also be applied as a matter of New York law."  Hart, 897 F. Supp. at 714; see In re Agent Orange Prod. Liab. Litig., 597 F. Supp. 740, 801 (E.D.N.Y. 1984) ("Where [the borrowing statute] causes another state's statute to be borrowed, that state's statute and the interpretations given its tolling and other provisions will be applied as a total package."); Antone v. General Motors Corp., 484 N.Y.S.2d 514, 519 (1984) ("[I]n 'borrowing' a [s]tatute of [l]imitations of another State, a New York court will also 'borrow' the other State's rules as to tolling.").  Juch-Tech maintains that under Ontario law, the running of the two-year limitations period under the Act therefore should be tolled because Intelsat fraudulently concealed the true facts.  (Pl.'s Mem. at 14).  In its papers, Juch-Tech relies on three cases considered by its Ontario law expert, David Shiller, in support of this proposition.  (See Pl.'s Mem. at 14-15 (citing M.(K.) v. M.(H.), 1992 CarswellOnt 841; Giroux Estate v. Trillium Health Centre, 2005 CarswellOnt 241;

13

and <u>Bell ExpressVu Limited Partnership v. Pieckenhagen</u>, 2013 CarswellOnt 3881)).

According to Mr. Shiller, these cases establish that the Act does "not apply in a case of

fraudulent concealment or where there is an allegation of direct, deliberate fraudulent

misrepresentations by a defendant for the purpose of deceiving the plaintiff and

preventing the plaintiff from discovering the underlying unlawful acts."  (Decl. of David

Shiller, Esq., dated March 11, 2014 ("Shiller Decl.") ¶ 16 (superscripts omitted)).

      Intelsat disputes the applicability of these cases through the declaration of

its own Ontario law expert, Michael J.W. Round.  (ECF No. 16 (Decl. of Michael J.W.

Round, dated February 24, 2014 ("Round Decl."))).  As Mr. Round accurately notes,

none of the cases upon which Juch-Tech relies expressly address the Act.

      In deciding questions of foreign law, the court may rely on "any relevant

material or source, including testimony, whether or not submitted by a party or admissible

under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1; <u>see</u> <u>AIM Int'l Trading,</u>

<u>L.L.C. v. Valcucine S.p.A.</u>, No. 02 Civ. 1363 (PKL), 2003 WL 21203503, at *5

(S.D.N.Y. May 22, 2003) ("In a typical litigation involving foreign law, a motion to

dismiss may be an appropriate time to decide the substance of another country's law that

bears on the case at hand.").  Here, rather than attempting to resolve the disagreements

between the experts, I will assume that Juch-Tech's expert has correctly stated the

applicable law regarding tolling.[7]

---

     [7]     There consequently also is no need to consider Juch-Tech's contention that Mr.
Round's declaration should be stricken because he is hopelessly biased against Juch-Tech, which
(continued...)

2.      Application of Law to Facts

a.      Statute of Limitations

In the New York courts, an action is commenced by "filing a summons and complaint or summons with notice."  N.Y. C.P.L.R. § 304(a).  Juch Tech did so by filing its summons and complaint on November 26, 2013.  (See ECF No. 1 (Notice of Removal) ¶ 1).  Accordingly, for Juch-Tech's claims to be timely, the Court would have to find that Juch-Tech could not reasonably have discovered the four matters required by the Act prior to November 26, 2011.  By then, of course, the 2009 Agreements both had been signed.  (Compl. ¶ 3-C).  Additionally, Tim Hewitt had disclosed that DCC was a "known trouble maker."  (Id. ¶ 33).  Moreover, Juch-Tech had filed its counterclaims in the D.C. Action, which alleged virtually all of the facts upon which it relies in support of its present claims.  (Calandra Decl. Ex. 2).  As a result, Juch-Tech cannot deny that well before late November 2011 it had discovered (1) that an injury or loss had occurred (2) as a result of an act or omission and (3) that a lawsuit would provide an appropriate remedy.  See Act § 5(1)(a).  Juch-Tech's only argument under the Act consequently is that it had not – and could not have – discovered prior to then that it had a claim against Intelsat, rather than another of the Intelsat Entities.  Although Juch-Tech alleges that it first learned the necessary information in late 2013, its assertion is not supported by the record.

---

[7](...continued)
brought a lawsuit against him and his firm in 2005.  (See Pl.'s Mem. at 9-11).

15

The crux of Juch-Tech's argument for tolling rests on its contention that it did not discover until October 2013 that Schwarcz was an employee of Intelsat.[8]  (See Pl.'s Mem. at 7, 12).  The allegation that Juch-Tech first discovered this allegedly vital information in October 2013 appears only in Juchniewicz's declaration submitted in opposition to Intelsat's motion.  (ECF No. 8).  It thus arguably is not a fact that this Court properly can consider in connection with Intelsat's motion for judgment on the pleadings. See Sellers, 842 F.2d at 642.

In any event, even if the Court were to consider Juchniewicz's assertions, Juch-Tech would not be able to overcome the Act's limitations period because the identity of Schwarcz's employer had no bearing on Juch-Tech's ability to bring a claim against Intelsat.  "Under New York law, a principal is chargeable with the acts and knowledge" of its agent "unless the agent totally abandoned the principal's interests and acted entirely for his own or another's purpose."  In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010), aff'd sub nom. Food Holdings Ltd. v. Bank of Am. Corp., 423 F. App'x 73 (2d Cir. 2011) (internal quotation marks omitted).  Here, as the Transition Agreement makes clear, Intelsat was a fully-disclosed principal.  Accordingly, in the absence of any suggestion that Intelsat and Intelsat USA were working at cross purposes, Intelsat was, as a matter of law, liable for the numerous fraudulent misrepresentations that Intelsat USA or other Intelsat Entities allegedly made to Juch-

---

[8]     Curiously, however, this allegedly critical fact appears nowhere in its Complaint. Indeed, Juch-Tech refers to Schwarcz throughout the Complaint as an employee of Intelsat USA.

Tech to induce Juch-Tech to enter into the 2009 Agreements.  Indeed, Intelsat was the sole counterparty on the Transition Agreement, the principal agreement that Juch-Tech signed.  Additionally, for the purposes of Juch-Tech's causes of action in equity, this fact alone is sufficient, as an action for rescission under New York law is always appropriate against the counterparty to an agreement, regardless of the source of any mistake.  See In re Clark's Estate, 253 N.Y.S. 524, 527-28 (4th Dep't 1931).

Furthermore, the Act does not require that a party be certain that it ultimately will succeed on a claim against a potential defendant before it may file suit.  If that were the standard, no limitations period ever would commence.  Thus, the Act can only be read to require that the party have known, or reasonably "ought to have known," enough information on which to base a plausible claim.  Given the pleadings in this case and Juch-Tech's own admissions in the D.C. Action, Juch-Tech can show no set of facts that would establish that it could not, through reasonable diligence, have discovered that Intelsat was a potentially liable party within the limitations period.

In sum, Juch-Tech reasonably "ought" to have known that Intelsat was a proper party defendant by the time that it filed its counterclaims in the D.C. Action.  It follows that, unless Juch-Tech is entitled to toll the statute of limitations, its claims against Intelsat are barred by the two-year limitations period under the Act.

    b.  <u>Fraudulent Concealment</u>

Juch-Tech maintains that it is entitled to tolling because Intelsat concealed important facts.  In particular, Juch-Tech argues that it "could not discern [prior to 2013]

that Intelsat . . . deceived it or that suing Intelsat was a remedy it should pursue." (Pl.'s Mem. at 15). As noted previously, however, it was Intelsat – not Intelsat USA – that was Juch-Tech's counterparty on the Transition Agreement. Therefore, as a matter of law, Intelsat was liable for the misrepresentations of Schwarcz and others, even if they were employed by Intelsat Entities rather than Intelsat itself. It follows that the failure to disclose Schwarcz's employer did not detract from Juch-Tech's ability to sue Intelsat based upon the alleged wrongdoing of Intelset USA or any other Intelsat Entities.

Grasping at straws, Juch-Tech also argues that Intelsat USA engaged in fraudulent concealment by aggressively opposing discovery in the D.C. Action. Although Intelsat USA admittedly may not have been a poster child for cooperation in pretrial discovery in that lawsuit, its first motion to dismiss Juch-Tech's counterclaims was, in fact, partially successful. As such, it was not inappropriate for Intelsat USA to seek a stay of discovery. Additionally, for the same reasons noted above, Juch-Tech ought to have been aware of the essential elements of its claims against Intelsat in this action by the time it filed its counterclaim in the D.C. Action. Whether discovery in that action was stayed or not therefore is not a basis to claim that Intelsat fraudulently concealed relevant facts.

Juch-Tech's claim of fraudulent inducement in its Complaint in this action is equally unavailing as a basis for tolling. In its Complaint, Juch-Tech alleges that the Intelsat Entities committed a fraud in the course of the negotiations leading up to the execution of the 2009 Agreements. However, even Juch-Tech's expert does not suggest

18

that this alone would be sufficient to toll the limitations period under the Act.  Rather, for such a result to obtain, the fraudulent misrepresentations must have been uttered "for the purpose of deceiving the plaintiff and preventing the plaintiff from discovering" the truth. (See Shiller Decl. ¶ 16 & Ex. F (Bell ExpressVu decision) at 5).

Juch-Tech has not plausibly alleged that Intelsat perpetrated a fraud not just to induce it to sign the 2009 Agreements, but to conceal its involvement in the transaction and consequent amenability to suit.  Indeed, the only allegation in the Complaint to that effect is Juch-Tech's conclusory assertion that "Intelsat Corp. and its parent and related corporations constructe[d] a multi-level and multi-faceted corporate structure . . . which plaintiff contends, is intended to shield the corporate entities from legal actions, discovery, inspection of records, and accountability including court ordered judgment and relief."  (Compl. at 2 n.1).  The Court need not credit such wholly conclusory assertions in deciding whether judgment on the pleadings is warranted.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Moreover, it simply is not plausible that a commercial enterprise comprised of numerous separately incorporated entities would have adopted that structure so that it could defraud its counterparties, where, as here, the name of the contractual counterparty that the plaintiff now seeks to sue was fully and accurately disclosed as part of the deal documents.

Juch-Tech therefore is not entitled to toll the statute of limitations on the theory that Intelsat engaged in fraudulent acts that enabled it to conceal its potential liability for the misconduct alleged in the Complaint.[9]

IV.   Defendant's Motion for Leave to Amend

Intelsat also seeks to file a supplemental pleading so that it may bring a counterclaim against Juch-Tech based on its commencement of this action in state court and subsequent unsuccessful remand motion.  (Def.'s Mem. at 19-22).  Juch-Tech contends that the Court cannot exercise such supplemental jurisdiction because Intelsat's counterclaim is not compulsory and lacks an independent jurisdictional basis.  (Pl.'s Mem. at 21).

A federal court may exercise supplemental jurisdiction over state law claims when a federal claim vests the court with subject matter jurisdiction and the state and federal claims "derive from a common nucleus of operative fact."  United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966).  Nonetheless, a district court "may decline to exercise supplemental jurisdiction . . . if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "Although there is no 'mandatory rule to be applied inflexibly in all cases,' it is clear that 'in the usual

---

[9]      Juch-Tech also urges the Court to hold an evidentiary hearing to resolve disputed factual issues bearing on the statute of limitations issue.  (See Pl.'s Mem. at 20 (citing Wen Liu v. Mount Sinai Sch. of Med., No. 09 Civ. 9663 (RJS), 2013 WL 950761, at *2-3 (S.D.N.Y. Mar. 12, 2013); Upadhyay v. Sethi, No. 10 Civ. 8462 (NRB), 2012 WL 1195233, at *2 (S.D.N.Y. Apr. 5, 2012); Hallock v. United States, No. 6:09-cv-1141 (DNH/DEP), 2010 WL 4025615 (N.D.N.Y. July 28, 2010))).  Juch-Tech has not shown that there are any disputed issues of fact that would require such a hearing.  Accordingly, this request should be denied.

case in which all federal-law claims are eliminated before trial,' the balance of factors will weigh in favor of declining to exercise supplemental jurisdiction."  TPTCC NY, Inc. v. Radiation Therapy Servs., 453 F. App'x 105, 107 (2d Cir. 2011) (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988)); see also Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) ("If the federal law claims are dismissed before trial the state claims should be dismissed as well.") (internal alterations and quotation marks omitted).

Here, if Juch-Tech's claims are dismissed, as I have recommended, the Court will be left with no claims over which it has original jurisdiction.  Accordingly, the Court should decline to exercise jurisdiction over Intelsat's state law counterclaims.  See 28 U.S.C. § 1367(c)(3).

## V.    Conclusion

Intelsat has moved for judgment on the pleadings and to file a supplemental pleading containing counterclaims.  (ECF No. 14).  The motion for judgment on the pleadings should be granted; the motion to file a supplemental pleading should be denied.[10]

---

[10]    Both of Juch-Tech's attorneys have moved to withdraw as counsel.  (ECF Nos. 33, 35).  Those motions are unopposed.  If the Court adopts this Report and Recommendation, those motions should be closed as moot.  In the event the Court rejects this Report and Recommendation, those motions should be granted and, in the event Juch-Tech does not retain new counsel, default should be entered, as Juch-Tech could not proceed without counsel. Rowland v. Cal. Men's Colony, 506 U.S. 194, 201-02 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in federal courts only through licensed counsel.") (citations omitted).

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties are hereby directed that if they have any objections to this Report and Recommendation, they must, within fourteen days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Lewis A. Kaplan, United States District Judge, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Kaplan. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Dated:    New York, New York
          August 21, 2014

                                    FRANK MAAS
                                    United States Magistrate Judge

Copies to All Counsel via ECF

22